UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAMILLE KOTOWSKI,

        Plaintiff,

v.

        Case Number 06-15278
        Honorable David M. Lawson

DAIMLER-CHRYSLER CORPORATION
LONG TERM DISABILITY BENEFIT PLAN,
and DAIMLER-CHRYSLER CORPORATION,

        Defendants
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION TO AFFIRM PLAN ADMINISTRATOR'S DECISION
AND DENYING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE ADMINISTRATIVE RECORD**

    The plaintiff, Camille Kotowski, filed this action challenging the decision of the defendants to terminate benefits previously granted her under a long-term disability insurance contract. The plaintiff claimed that she could no longer perform any work because of mental health ailments and began receiving benefits in 2000. The defendants terminated those benefits in 2005 after a series of evaluations and surveillance videos that suggested that the plaintiff was not disabled. The present matter, brought under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, was commenced after the plaintiff's unsuccessful administrative appeal. Upon the plaintiff's submitted procedural challenge, the Court allowed limited discovery, after which the parties filed cross motions on the administrative record. Oral argument was held on November 13, 2007. The Court has reviewed the administrative record and the parties' submissions and now concludes that the defendants were justified in terminating disability benefits because a reasonable view of the evidence could lead one to conclude that the plaintiff was no longer disabled as defined by the plan.

The decision to deny further benefits, therefore, was not arbitrary or capricious. The Court will grant the defendants' motion to affirm the plan administrator and deny the plaintiff's motion to reverse.

I.

The plaintiff, who is fifty-six years old, began working for DaimlerChrysler in 1986 as a benefits administrator. She continued with the company until she became disabled on May 17, 1999. The Social Security Administration (SSA) found her disabled and entitled to benefits effective November 1999, and it appears that the defendants determined that she qualified for benefits under the company disability plan on July 7, 2000.

The defendants' disability plan requires as a condition of receiving long-term disability benefits that an employee "be 'totally disabled' because of disease or injury so as during the first 24 months of disability to be unable to perform the duties of the Participant's occupation, and after the first 24 months of disability be unable to engage in regular employment or occupation with the Corporation." Administrative Record (AR) at 15. The defendants found that the plaintiff fit that definition because she suffered from depression, anxiety, and panic attacks that rendered her unable to work.

The protocol established by the disability plan and the plan administrator required the plaintiff to submit Certifications of Continuous Disability (CCDs) to maintain her entitlement to benefits, since a claimant becomes ineligible for benefits on "the date the Participant no longer satisfies the total disability requirements." AR at 16. The administrative record apparently does not contain all CCDs submitted by the plaintiff, but it does contain a few of them. The first CCD found in the record is dated September 9, 2002. Therein, the plaintiff reported that she was "currently

disabled" and her attending physician was Dr. T. Abbasi. AR at 220. She described her "daily activities" as follows: "Don't do much. Lay on couch most day. Getting dressed can take 3-4 hours. Try to do light work around house, but don't accomplish anything. Husband helps with meals and cleaning house." *Ibid.* In the next CCD dated March 4, 2004, the plaintiff also reported disability due to depression, anxiety, and panic attacks. She described her daily activities thus: "Not much. Usually sit or lay down most of day. Frequent doctors. Husband helps with meals and cleaning house. Always overwhelmed – causing screaming and yelling fits." AR at 209. On June 13, 2005, after the surveillance began, the plaintiff submitted another CCD reporting the same disabling conditions and describing her daily activities in much the same fashion: "Sleep or lay down most of day. Always overwhelmed, so don't do much at all – being overwhelmed causes panic attacks. Go to doctors. Husband helps with house cleaning and meals." AR at 184.

The plaintiff's complaints initially were supported by a number of medical opinions. The first opinion contained in the record is that of Dr. Calmeze H. Dudley, a board-certified psychiatrist, who performed a medical examination at the request of DaimlerChrysler. Dr. Dudley determined that the plaintiff suffered from severe anxiety. At the time of the examination, the plaintiff was taking two doses of Xanax per day plus other medication as prescribed by Dr. Abbasi and was seeing Dr. Abbasi once every two months. The plaintiff told Dudley that her symptoms had not improved, and she stressed that, for her, the simplest task was virtually impossible. Among other things, the plaintiff stated that she "hate[s] people" and has trouble even picking up food from a drive-thru window. AR at 216. The plaintiff told Dr. Dudley that she doesn't drink alcohol but admitted that she smokes 1.5 packs of cigarettes per day. Based on these and other facts, Dr. Dudley offered the following diagnosis and conclusions:

DIAGNOSIS

AXIS I  Panic Disorder with Agoraphobia, ongoing.
     General Anxiety Disorder.
AXIS II  Borderline and Histrionic Personality Disorder, her main diagnosis.
AXIS III  Essential hypertension, controlled on medication.

CONCLUSIONS

. . .

In summary, within a reasonable degree of medical certainty, I find her to be totally but temporarily disabled, both due to her anxiety, apparent recurrent panic attacks, and most particularly her personality disorder. While the personality problems are not likely to benefit from any medication, the other entities could certainly be improved upon were appropriate medication offered. I will suggest 1 final trial of a 2 month duration followed by another independent medical evaluation examination, assuming my recommendations can be put into place. If at that time no change has occurred, I would render total and permanent disability. Her prognosis remains guarded to poor in any event.

AR at 218.

The plaintiff's treating physician, Dr. T. Abassi, generally concurred. He had been treating the plaintiff since April 1, 2000, and in a report dated March 6, 2004 Dr. Abassi wrote that his "objective findings" included "flat affect, dep[ressed] mood, slow speech, psychomotor retardation," as well as diminished sleep, energy, and motivation. AR at 208. On July 28, 2004, Dr. Abassi opined that the plaintiff was still clinically depressed and still disabled.

Beginning in August 2004, DaimlerChrysler arranged for the plaintiff to be seen by Dr. Elliott Wolf, who examined the plaintiff on August 4, 2004 and again on October 18, 2004. Dr. Wolf documented the plaintiff's frustration over seeing no improvement of her symptoms and her inability to handle daily life. He noted that she was "clearly depressed" and found her "somewhat distraught" and "irritable." AR at 195, 199. Dr. Wolf was troubled by the plaintiff's pharmaceutical regimen and expressed his view that the plaintiff would do well to consider electroconvulsive therapy (ECT), which Dr. Abassi previously had suggested. Dr. Wolf noted that the plaintiff had

rejected ECT as a treatment option "based upon what she has seen in the movies," and he believed that "she may very well be permanently disabled unless she has ECT, and if she does undergo electroconvulsive therapy, she may be able to return to work within 8 to 12 weeks." AR at 195-96, 198.

The plaintiff met with Dr. Wolf for another company-sponsored examination on February 10, 2005. At that time, Dr. Abassi had changed the plaintiff's medication, but she still displayed "no significant clinical improvement." AR at 188. Dr. Wolf again expressed disapproval of the plaintiff's pharmaceutical regimen, saw no point in continuing this course of treatment, and reiterated his sentiment that ECT was the only viable option.

The plaintiff saw Dr. Abassi again on February 26, 2005, who noted many of the same symptoms, including depression, low self-esteem, lethargy, and anxiety, but he also observed an apparently new development in the form of suicidal ideation. Dr. Abassi maintained that the plaintiff was totally disabled, and he evidently continued the plaintiff on the same course of treatment.

In April 2005, DaimlerChrysler and one of its "in-house doctors," a Dr. Bartlett, authorized surveillance of the plaintiff. It is unclear what prompted this decision, but it is apparent that the defendants suspected that the plaintiff was malingering. Surveillance was conducted on May 16, 17, 18, and 30, and again on June 20, 22, and 27. It appears that surveillance also had been performed on the plaintiff sometime in 2002. The surveillance footage, which was made part of the administrative record, consumes about three hours of video (including the 2002 footage), and there is no real dispute over its contents. The 2002 footage has little bearing on the present dispute. However, beginning on the morning of May 16, 2005, the plaintiff was seen walking her dog outside

her home, and then driving to a tanning salon. The plaintiff left the tanning salon after fifteen minutes and made her way to a drive-thru ATM. After completing the transaction, the plaintiff went back home and remained there for four hours. At 1:45 p.m., she got back in her car and drove to a McDonald's restaurant, purchased a meal through the drive-thru lane, and went back home for the night.

On May 17, 2005, the plaintiff was seen driving to a Lowes home-improvement store at 8:00 a.m. She retrieved a shopping cart and spent approximately forty minutes in the store. After leaving Lowes, the plaintiff drove immediately to Meijer's. She spent forty-five minutes in Meijer's and left with five bags of groceries. The plaintiff apparently ran some more errands until noon, but the surveillance team lost her in traffic. They caught back up with her at her home, where she remained until 2:00 p.m. At 2:00, the plaintiff left her house and drove to a bar in Sterling Heights named "MacKenzie's Tavern." The surveillance team followed the plaintiff into the bar and watched as she drank beer, smoked cigarettes, and talked with other patrons until 6:00 p.m. The surveillance report states that she talked to "several adult males" and "drank between 4 to 6 beers." AR at 120. According to one of the surveillance personnel, the plaintiff complained to one individual that, since her husband had retired, "all [he] wanted to do was to sit and watch TV." *Ibid.* The plaintiff arrived back home at approximately 6:30 p.m., and no other activity was recorded that night.

On May 18, 2007, the plaintiff was observed walking into her backyard at around 12:40 p.m. She cleaned up a number of "dog deposits" and pulled weeds around the base of her pool. The plaintiff spent the rest of the day indoors. On May 30, 2005, the investigators filmed the plaintiff tending to plants outside for roughly one-half hour, after which she sprayed down the pool and patio for a few minutes. The plaintiff performed various other gardening tasks, and fifty minutes later she

returned to her home.  Surveillance was resumed on June 20, 2005, when at 10:00 a.m. the plaintiff traveled to Wal-Mart with her husband.  They spent fifteen minutes in the store, and then traveled to a building-supply store in Southfield, where they remained for around forty-five minutes.  Then they drove to "Brady's Burgers" in Hazel Park, picked up some lunch, and headed back home.  They spent an hour-and-a-half inside, and then at 2:00 p.m. they drove to MacKenzie's in Sterling Heights, where the remained for over two-and-a-half hours.  While inside, the plaintiff sat at the bar with her husband and drank several beers, had several conversations with her husband and other patrons, and played several games of Keno.

On June 22, 2005, the plaintiff and her husband were first observed at 12:45 p.m. smoking cigarettes on their front porch.  At around 1:30 p.m., they drove to a nearby residence.  While the plaintiff's husband remained in the car, the plaintiff went inside for roughly fifteen minutes.  At 2:00 p.m., the plaintiff and her husband again made their way back to MacKenzie's.  The surveillance team entered the bar at 3:00 p.m. and observed the couple drinking, smoking, and socializing.  The plaintiff and her husband left the bar at 5:20 p.m., after which surveillance was terminated.

The last day of surveillance was June 27, 2005.  While working on a different job, the surveillance team observed the plaintiff's car parked once more outside MacKenzie's Tavern.  One of the investigators reported that he entered the tavern and saw the plaintiff sitting at the bar alongside her husband, where she was drinking a beer, smoking a cigarette, and talking with a woman standing next to her.

On June 20, 2005, Dr. Wolf examined the plaintiff again.  He met with the plaintiff for fifteen minutes.  Although he had not viewed any of the surveillance video prior to the meeting, he

did watch some of the May footage after the exam. In his report prepared after viewing the film, Wolf concluded that the plaintiff was malingering and in fact fit for work. The video evidence plainly had a strong influence on Dr. Wolf's opinion. He wrote:

> When I have seen Ms. Kotowski in the past, I have diagnosed her with severe major depression, which appeared to be refractory to treatment with a variety of medications. . . . Today she claimed that she has experienced absolutely no symptomatic improvement whatsoever since last seen by me four months ago. She rather theatrically stated, "Maybe I just need to accept that my life is over." Several times she yelled at this examiner in a rather dramatic fashion. When asked what she does at home in an average day, she stated, "Nothing. All I do is sit on my back porch once in a while and on Friday mornings between 6:30 and 7:00, I go to the grocery store so that I don't have to deal with anybody." Ms. Kotowski stated that she has difficulty driving, so that her husband drove her to this appointment today.
>
> Subsequent to the interview, I was presented with a surveillance videotape of some of Ms. Kotowski's activities to review. The videos appeared to have been shot on May 16th, 17th, and 18th, as well as May 30th of this year. They depict Ms. Kotowski in a variety of daily activities. The video is 39.5 minutes in length. Among other things she is seen entering and leaving a tanning salon with a 15-minute interval between her entrance and departure. She is seen doing some grocery shopping at approximately 9:30 in the morning, going to lunch, sitting in a bar in the afternoon. She is shown in her back yard doing a variety of maintenance and gardening activities in the afternoon. She is shown doing sustained work for at least 30 minutes at a time. She is shown going to a home improvement store and doing some shopping between 8:00 and 9:00 in the morning, as well as driving herself in a dark blue van to these various activities.
>
> . . .
>
> Based upon the information currently available to me, it is my opinion that Camille Kotowski is fit for duty without restrictions, in a full time capacity, as of the date of this appointment. The videotape clearly indicates that the history that Ms. Kotowski presented to me in interview, at least today if not during my previous evaluations of her, is, at the very least, grossly exaggerated. She either fabricates symptoms or severely exaggerates the extent of her symptomology since in interview she claims that she is essentially immobilized by depression, while the video clearly reveals that this is not the case. This appears to reflect a conscious effort on Ms. Kotowski's part to mislead the examiner and present herself as being more ill than in fact she is. Once again, based upon this information, in my judgment, she is fit for duty as of today's date.

AR at 181-82.

On June 27, 2005, based on the report from Dr. Wolf, DaimlerChrysler called the plaintiff into work. The plaintiff met with the plant physician, Dr. Barton, and was very upset. It appears that the plaintiff was not confronted with the surveillance tapes until after her visit with Dr. Barton. Until then, the plaintiff maintained her story that she was immobilized due to depression, only went outside to tend to her garden, and had not drank beer in six months. "Upon specific questioning about socializing, going to concerts/clubs/bars, she sa[id] she never does that because she cannot be around people." AR at 110. She also stated that she "never goes out to run errands because she can't tolerate being around people." *Ibid.* "Upon being asked if she ever tried to be in a situation where she could interact with people, she said no. Upon being asked if she could go to a restaurant for lunch, and then sit at the bar talking, [the plaintiff] reported she would not be able to make it through lunch, let alone sit there drinking at the bar." *Ibid.* When the plaintiff was confronted by the investigators with the video evidence to the contrary, she "attempted to tell them that they had happened to videotape her on days when she had to run errands and other chores because her husband was so sick he was unable to do so." *Id.* at 111.

As noted above, one of the investigators saw the plaintiff later that evening – on June 27, 2005 – drinking beer in a bar. The plaintiff drank heavily that evening as part of an alleged suicide attempt. According to records from St. John Macomb Hospital, the plaintiff consumed 20 to 25 pills of a weight-loss supplement called "Metabolite," and she had a blood-alcohol content of 0.11 milligrams per deciliter. The plaintiff's husband drove her to the hospital after confronting her at home, where she stated that she wanted to die because she could not handle life anymore. The plaintiff remained hospitalized until July 2, 2005.

The plaintiff met with Dr. Wolf again on July 26, 2005. Dr. Wolf opined that the plaintiff's "suicide attempt" was not "a serious or genuine effort to take her own life," evidently coming to this conclusion based on the relatively benign nature of Metabolife and inconsistent statements to hospital staff. AR at 134-35.

Based on this series of events, DaimlerChrysler terminated the plaintiff's claim for long-term disability benefits on August 1, 2005. DaimlerChrysler stated that the plaintiff was not "totally disabled because of disease or injury so as to be unable to engage in regular employment or occupation with the Corporation." AR at 114. DaimlerChrysler terminated the plaintiff's employment on August 23, 2005 for "a violation of DaimlerChrysler's Standards of Conduct," to wit, "providing false or misleading information to the Corporation." *Id.* at 1-2.

On September 22, 2005, the plaintiff filed a timely appeal of the benefits denial. Attached to the letter of appeal was a document signed by Dr. Abassi and therapist Judith Willis reporting that the plaintiff was still "clinically depressed and unable to work." AR at 113. However, the report does not make mention of the surveillance video or otherwise suggest that Dr. Abassi and Willis had seen it.

On October 24, 2005, DaimlerChrysler denied the plaintiff's appeal. In reaching this decision, DaimlerChrysler relied on a comprehensive report prepared by ESIS. The report was evidently drafted by a registered nurse, but the identity of this individual is not set forth in the document. In any event, after setting forth the narrative in a manner essentially consistent with the facts described above, the nurse-evaluator concluded that the plaintiff had been malingering. The nurse dismissed the apparent suicide attempt and criticized the plaintiff for not agreeing to treatment recommended by Dr. Wolf. She recommended upholding the decision to terminate benefits.

Following the denial of her appeal, the plaintiff commenced the present action on November 29, 2006 under section 502(a) of ERISA to recover benefits under her employer's disability plan. On March 12, 2007, the plaintiff filed a statement of procedural challenge alleging conflict of interest because DaimlerChrysler both funds and administers the plan, bias on the part of Dr. Wolf because he may be inclined to deny claims based on his relationship with DaimlerChrysler, and an incomplete review on the part of Dr. Wolf because he only watched 39 to 40 minutes of the three hours of surveillance video.

On March 30, 2007, the Court allowed the plaintiff to take Dr. Wolf's deposition on the question of whether he considered all the available evidence. Dr. Wolf testified that he works for a company called Qualified Medical Examiners, and he is paid based on the number of examinations he performs. Although he handles some workers' compensation cases, the vast majority of Wolf's work consists of disability benefits evaluations. Approximately 25% to 30% of his business from Qualified consists of evaluations of DaimlerChrysler employees. On average, Qualified pays Wolf $125,000 per year. Dr. Wolf further testified that, of all the patients he evaluates for DaimlerChrysler, he finds 55% disabled and 45% fit to work. When asked whether Qualified encouraged him to overturn findings of disability, Wolf unequivocally stated that this did not occur.

In this case, Dr. Wolf said that he watched 39 to 40 minutes of the surveillance footage, and he was not aware that there was other footage from 2002 and June 2005 until approximately one week before the deposition. Dr. Wolf stated that he had not reviewed the balance of the footage since then, and he explained that it would be unlikely to affect his opinion for want of relevance. Dr. Wolf confirmed that the plaintiff was "quite theatrical" during the June 20, 2005 examination. Based on that alone, Dr. Wolf began to have some doubts about the plaintiff's sincerity even before

viewing the video. However, he confirmed that the main impetus for his conclusion of malingering arose from the video.

II.

The plaintiff challenges the termination of benefits under section 502(a)(1)(B) of ERISA, which authorizes an individual to bring an action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). She contends that the denial of her claim must have been the result of a conflict of interest arising from the authority of the plan administrator both to provide benefits and administer the claim. She also argues that the benefit termination decision should be overturned because (1) Dr. Wolf was not provided with all pertinent information, (2) the defendants "shopped" for a medical opinion that suited their interests, (3) Dr. Wolf's biases and conflicts of interest affected his decision, and (4) the nurse who authored the appeal denial recommendation based her decision on an analysis that is neither reasoned nor rational.

"[A] plan administrator's decision is reviewed 'under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" *Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 933 (6th Cir. 2000) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). The parties in this case agree that the standard of review is the arbitrary and capricious standard. This deferential review is appropriate when the ERISA plan at issue, as here, provides a clear grant of discretion to the plan administrator

and the decision being appealed was made in compliance with plan procedures. *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595, 597 (6th Cir. 2001).

The arbitrary and capricious standard of review "is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (internal quotes omitted). When applying this standard, the court must determine whether the administrator's decision was reasonable in light of the available evidence. Although the evidence may be sufficient to support a finding of disability, if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision was not arbitrary or capricious. *See Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000). However, the court of appeals has clarified that "the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Cooper v. Life Ins. Co. of North America*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). If the evidence is one-sided in favor of the claimant, or if the administrator's interpretation of the plan finds no support in its text, the Sixth Circuit has not hesitated to overturn a benefit denial. *See ibid.*; *Rochow v. Life Ins. Co. of North America*, 482 F.3d 860 (6th Cir. 2007); *Haus v. Bechtel Jacobs Co., LLC*, 491 F.3d 557 (6th Cir. 2007).

Nonetheless, a plan administrator's decision reviewed under the arbitrary and capricious standard must be upheld if it is supported by "substantial evidence." *Baker v. United Mine Workers of Am. Health & Retirement Funds*, 929 F.2d 1140, 1144 (6th Cir. 1991). Substantial evidence supports an administrator's decision if the evidence is "rational in light of the plan's provisions." *See Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997).

The plaintiff first mentions a conflict of interest and suggests that this structural conflict might impact the standard of review. It is undisputed that DaimlerChrysler both funds the long term disability plan and passes on the benefits applications. However, the presence of a conflict of interest does not require relaxation of the deferential arbitrary and capricious review standard or mandate *de novo* review of the plan administrator's decision. *Marchetti v. Sun Life Assur. Co. of Canada*, 30 F. Supp. 2d 1001, 1007 (M.D. Tenn. 1998). Rather, the conflict of interest is a factor taken into account when evaluating the decision under the arbitrary and capricious standard. *Calvert v. First Star Finance, Inc.*, 409 F.3d 286, 297 (6th Cir. 2005); *see also University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000). The mere existence of a structural conflict of interest is not enough to justify heightened scrutiny of the plan administrator's decision. The plaintiff must provide actual evidence that the conflict of interest had some effect on the administrator's decision. *See Peruzzi v. Summa Med. Plan*, 137 F.3d 431, 433 (6th Cir. 1998). No such evidence was presented in this case.

The plaintiff next attacks Dr. Wolf's opinion because he did not watch all three hours of surveillance video, and she contends he is biased because of his position as a hired evaluator. The plaintiff also contends that the six reasons given by the nurse in support of denying the appeal are faulty. These arguments may have some force in a case that requires *de novo* review, but the Court finds them unpersuasive in light of the governing standard in this case. The main issue here is whether there is substantial evidence supporting the plan administrator's determination that the plaintiff is no longer disabled within the meaning of the plan.

To be eligible for long-term disability benefits under the plan, the plaintiff must "be 'totally disabled' because of disease or injury" such that she is "unable to engage in regular employment or

occupation with the Corporation." AR at 15. The concept of disability, therefore, is defined in terms of functional limitations. Although these functional limitations must, of course, be caused by a disease or injury, in the end – borrowing from Social Security disability jurisprudence – the disability determination "is an assessment of what [the claimant] can and cannot do, not what she does and does not suffer from." *Howard v. Comm'r of Soc. Sec.,* 276 F.3d 235, 239 (6th Cir. 2002).

The plaintiff was certified as disabled due to severe depression and anxiety that rendered her unable to interact with others, as she was required to do in her job. The plaintiff's symptoms did not respond to pharmaceutical treatment, and her disability status was maintained in large part due to self-reports to her treating and examining physicians. In various Certifications of Continuous Disability, the plaintiff stated that she did not "do much," and she "[u]sually s[a]t or la[id] down most of [the] day." AR at 220, 209; *see also id.* at 184. The plaintiff reported these symptoms as late as June 13, 2005, well after the surveillance began in May of that year. The plaintiff also consistently told her doctors that she could not stand to be around people, had trouble with the most basic social transactions like grocery shopping and ordering food, and avoided drinking and socializing. In fact, right before the plaintiff was confronted with the surveillance tape that showed her spending hours in a bar, she specifically stated that she "would not be able to make it through the lunch, let alone sit there drinking at the bar." AR at 110.

Yet the surveillance video completely contradicts the plaintiff's description of how her alleged disability impacted her daily activities. Since Dr. Wolf's assessment of the plaintiff was based almost entirely on the plaintiff's description of her symptoms, his change of opinion in light of the objective video evidence that contradicted the plaintiff's reports is logical and rational. Moreover, the surveillance video demonstrates that the plaintiff in all likelihood was fit to work,

since she had no problem running numerous errands and socializing at a bar over the course of several days. The termination of benefits was hardly arbitrary; rather it flowed quite naturally from the revelations demonstrating the plaintiff's ability to interact with others without exhibiting panic or anxiety.

The debate over whether the plaintiff's suicide attempt was genuine has little bearing on this holding. No one contests that the plaintiff suffers from depression, and the nurse-evaluator's flimsy conclusion that the suicide attempt was not "serious" takes nothing away from that diagnosis. Neither does it factor into the plaintiff's functional limitations. DaimlerChrysler terminated the plaintiff's benefits (and denied her appeal) based on its finding that the plaintiff was "not totally disabled" and, in fact, was "able to work." *Id.* at 108, 114. This decision was in turn based on the analyses of Dr. Wolf and the nurse-evaluator, both of whom developed their opinions of malingering and ability to work premised almost exclusively on the video evidence. Their doubts concerning the sincerity of the plaintiff's suicide attempt was ancillary to their findings; they were not a key part of DaimlerChrysler's decision.

Equally unpersuasive is the argument that Dr. Wolf was influenced by financial and personal bias. Even if Dr. Wolf were motivated to skew his findings in order to perpetuate his referral business, the surveillance footage injects a degree of objectivity that serves to neutralize the suggestion that Dr. Wolf's opinion was tainted by lucre. Money aside, the plaintiff also contends that Dr. Wolf's disdain for the plaintiff and her treating physician is apparent in his criticism of her pharmaceutical regimen and dismissal of her objections to ECT as unfounded. However, that viewpoint does not represent bias, but only a difference of opinion with the plaintiff's treating physician, which, based on the apparent lack of success, is a reasonable one.

The plaintiff also finds bias in Dr. Wolf's lack of interest in watching all of the video footage. The Court does not agree. Dr. Wolf watched 40 minutes of footage that covered the plaintiff's activities over four days in May 2005. That footage showed the plaintiff drinking in a bar, socializing, and running a number of errands with no apparent difficulty, all things she said she could not do. Certainly, there was no reason for Wolf to watch the 2002 footage, as that was irrelevant to whether the plaintiff was disabled in 2005. And there is no evidence that a review of the footage from June 2005 would have helped the plaintiff's cause: by watching the May footage alone, Dr. Wolf could see that the plaintiff had misrepresented material facts; and the June surveillance only would have showed him that the plaintiff again went out drinking and performed other activities that she had consistently denied.

Next, the plaintiff contends that Dr. Wolf's review was incomplete because he failed to verify the plaintiff's description of her symptoms. The plaintiff argues that she was "an unreliable narrator," and Dr. Wolf should have reviewed Dr. Abassi's records to verify her symptoms and course of treatment. There can be no doubt that Dr. Wolf should have questioned the accuracy of the plaintiff's narration of her symptoms, especially after viewing the surveillance videos. That aside, however, this argument has no bearing on the rationality of the defendants' decision to deny benefits. At most, this argument sounds in medical neglect, but it does nothing to impeach the conclusion that the plaintiff actually was able to work. That conclusion was based on the uncontradicted video evidence. If Dr. Abassi's reports of the plaintiff's condition were consistent with her own (which they appear to have been), then the plaintiff's behavior recorded on the videos would be all the more inconsistent. Alternatively, if Dr. Abassi's reports contradicted the plaintiff's reports to Dr. Wolf, then that would only amount to further evidence of misrepresentation.

The final argument offered by the plaintiff alleges improper "shopping" for a medical opinion. Divorced from the facts, the plaintiff's argument has superficial appeal: a corporation should not be able to subject an employee to a battery of evaluations by a multitude of doctors in the hopes that a finding of fitness to work eventually will turn up. When analyzed in context, however, the plaintiff's argument has no support in the record. First, the plaintiff was only seen by two doctors at the request of DaimlerChrysler, Dr. Dudley and Dr. Wolf. Second, and far more significantly, the plaintiff's argument ignores the fact that Dr. Wolf had a very good reason for changing his opinion. The plaintiff paints a picture of the defendants forcing her to see Dr. Wolf a number of times, just waiting for Dr. Wolf to eventually render an inevitable opinion of non-disability according to the law of averages. However, there was nothing random or inevitable about Dr. Wolf's decision; he consistently concurred in the finding of disability until he saw the surveillance video. There was no impropriety on the part of the defendants to seek further evidence of the plaintiff's continuing disability *vel non* and provide it to Dr. Wolf.

### III.

The Court finds that there is a reasonable explanation for the administrator's decision to discontinue benefits in this case in light of the plan's provisions and the evidence contained in the administrative record.

Accordingly, it is **ORDERED** that the defendants' motion to affirm the plan administrator's decision [dkt # 26] is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion to reverse the plan administrator's decision and award benefits [dkt # 29] is **DENIED**, and the plaintiff's complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson

<pre>
                                             DAVID M. LAWSON
                                             United States District Judge
</pre>

Dated: November 20, 2007

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 20, 2007.

                                            s/Felicia M. Moses
                                            FELICIA M. MOSES